UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

    Plaintiff,

vs.

SELIM STRUGA,

    Defendant.

                                   /

No. 11-51540

District Judge Gerald E. Rosen

Magistrate Judge R. Steven Whalen

**CERTIFICATION OF EXTRADITION**

Defendant Selim Struga, a native of Albania, is a naturalized American citizen. In 2001, he was tried *in absentia* in Albania for the 1989 murder of Gezim Celmeta. His conviction was reversed by the Albanian Court of Appeals, but reinstated by the Court of Cassation (Supreme Court). Albania seeks Mr. Struga's extradition. To that end, the government has filed a Request for Extradition of Selim Struga, with supporting documentation [Doc. #20]. The Court held an extradition hearing on March 15, 2016.[1]

---

[1] The extraordinary passage of time between Mr. Struga's arrest and the extradition hearing was due in large part to Mr. Struga having changed lawyers several times, and an apparent difficulty in having defense documents translated. The parties also stipulated to numerous adjournments of the extradition hearing. Mr. Struga was initially represented by attorney Carl Marlinga, who had to withdraw when he was appointed as a judge. On March 29, 2013, the Federal Defender Office was appointed to represent Mr. Struga [Doc. #35]. On May 13, 2014, the Court granted counsel's motion to withdraw, which had been filed at Mr. Struga's behest [Doc. #50]. On May 19, 2014, CJA panel attorney Marshall Goldberg was appointed [Doc. #51], and the extradition hearing was again reset

## I. FACTS

At the hearing on March 15, 2016,[2] the Court admitted the following government exhibits:

Exhibit 1: Michigan Driver's License information showing Mr. Struga's address in Royal Oak, Michigan. Transcript of Extradition Hearing, 25-26. (Mr. Struga interjected that he was arrested at his house in Troy, Michigan, not Royal Oak. Tr. 26. Nevertheless, both Troy and Royal Oak are within the Eastern District of Michigan).

Exhibit 2: The Declaration of Jason A. Biros, Attorney Advisor for the United States Department of State. Mr. Biros attests that the extradition treaty between the United States and Albania is in full force and effect. A copy of the treaty is attached to Mr. Biros' Declaration, and was admitted as Exhibit 3.

Also included with Exhibit 3 is a statement from Chancellor Rudin Baqli of the Albanian Supreme Court indicating that the offense of which Mr. Struga was convicted *in absentia*, and for which extradition is sought, was "'intentional murder', provided for in article 76 of the Criminal Code."

At the hearing, the government represented that the Department of State had

---

a number of times. As Mr. Struga was dissatisfied with Mr. Goldberg's representation, the Court granted his motion to withdraw on August 13, 2015 [Doc. #63]. Attorney Edward Wishnow, present counsel, was appointed in Mr. Goldberg's stead [Doc. #65], necessitating further requests for adjournments of the extradition hearing and for additional time to obtain translations of Mr. Struga's exhibits.

[2] The transcript of the extradition hearing is found at Doc. #81.

received assurances from the Republic of Albania that Mr. Struga would have the opportunity to challenge the *in absentia* conviction and seek a new trial. (Tr. 30). Admitted as Exhibit 4 are the original and translated "Guarantees granted by the Albanian State in respect of the right for retrial of the Albanian national Selim alias Selami Struga, subject to extradition from USA to Albania because of his trial in absentia."

Exhibit 5: Report of the Albanian General Prosecutor's Office, dated November 7, 2011, along with photographs and a witness statement of Fatmir Macka (originals and translations).

Exhibit 6: The decision of the Albanian Court of Appeals overturning Mr. Struga's conviction, and the Albanian Supreme Court decision reversing the Court of Appeals.

Exhibit 7: The Second Circuit's decision in *Skaftouros v. United States*, 667 F.3d 144 (2d Cir. 2011), offered for the principle that Courts should given deference to legal rulings from foreign countries.

Exhibit 8: A current (but enlarged) photograph of Mr. Struga from his Michigan driver's license.

Exhibit 9: A photograph from Mr. Struga as a younger man, contained in the Albanian court file.

Exhibit 10: Mr. Struga's birth certificate. Counsel questioned the authenticity of this document, and the Court admitted it subject to rebuttal evidence by Mr. Struga.

Exhibit 11: Mr. Struga's immigration file.

Also admitted as Mr. Struga's Exhibit A, over the government's objection, were a number of witness statements, with English translations. In addition, at Mr. Struga's request, the Court gave him six weeks to have additional documents translated. (Tr. 51).[3]

The documents admitted at the hearing indicate as follows concerning the facts of the underlying offense:

The Report of the General Prosecutor's Office, dated November 7, 2011 (Official Translation submitted as Government Exhibit 5) summarizes the following facts taken from an examination of the file and final decision of the District Court of Tirana, Albania following Mr. Struga's trial *in abstentia*. According to this document, the trial testimony showed that on June 21, 1989, Mr. Struga had been drinking in a bar. He was sitting at a table with Mehment Nezaj and Fatmir Macka. At about 5:00 p.m., Adriatik Kokona joined them, and later still, Bujar Rama and Gezim Celmeta ordered something and sat at their table. A "bottle was broken at the table" [passive voice used], and Mr. Struga and his friends started to use offensive words. As Rama and Celmata were leaving the bar, one of Mr. Struga's friends had an argument with Bujar Rama. Mr. Struga and his friends joined in, and Rama backed off. At that point, Mr. Struga and his friends began to have an argument with Gezim Celmeta, the homicide victim, "putting him in the middle." The Prosecutor's Report describes the ensuing events as follows:

---

[3] The Court has now received from Mr. Struga, through his counsel, a full set of translated documents.

> "At that time, [Mr. Struga] approached him [Celmeta], who, through a sharp pointed piercing instrument, hit Gezim Celmeta on the back area. Having seen that [Mr. Struga] held in one hand a knife, thinking that a criminal offence, a fight or jabbing could happen because the involved persons were not in a good state as they had been drinking, in order to be of any help to the citizen Gezim Celmeta, Bujar Rama grabbed at the counter desk the wooden ice cream spade and tarted to hit in the direction of Adriatik Kokona, Muhamet Nezaj and Selim alias Selami Struga, who went out of the bar running and left. The victim Gezim Celmeta also went out of the bar, who after walking for several meters, fell on the ground as a consequence of the suffered wound. Gezim Celmeta was immediately sent to the hospital but due to the jabbing and the wound suffered, he was dead."[4]

Government's Exhibit 5 also contains the statement of witness Fatmir Macka, made under penalty of perjury. He states that when he entered the bar, he met Mr. Struga and Adriatik Kokona. They sat together for about an hour, drinking and socializing. When he left, Mr. Struga, Mr. Kokona, and Mehmet Neza were still sitting at the table. After he went home, he heard there was a quarrel, and that Gezim Celmeta had been killed. Mr. Macka states that when he was at the bar, Mr. Celmeta was not there. He states that the police held him for five days after the killing, but was released because he had no relation to the crime. He identified a photograph of Mr. Struga.

Mr. Struga has submitted the statements (originals in Albanian, translated into English) of Adriatik Kokona (two statements), Muhamet Neza (three statements), Xhinovefa Karagjozi, Kleopatra Bega, Bujar Rama, Fatmir Xhemal Mjellari, and

---

[4] This summary of the facts adduced at trial is also reflected in Albanian Judge Gjin Gjoni's findings of fact and conclusions of law, which Mr. Struga has submitted to this Court.

-5-

Bashkim Mustafa Mysliu. These statements were taken by Albanian police investigators. The witnesses who were present in the bar around the time of the offense are as follows.

Adriatik Kokona

On or about June 24, 1989, Mr. Kokona stated that he did not recall Gezin Celmeta (the victim) being at the club. He said that he and his party (including Mr. Struga) broke some glasses by accident, and Mr. Struga paid for them. He said that Mr. Struga was wearing a red-colored shirt. He stated, "I did not see Sela (Struga) or Meti to have had a knife in their hand or to have had one with them."

On June 27, 1989, Mr. Kokona gave a second statement to Police Investigator Gezim Veleshnja. Kokona said that on the date in question, he went to the club "10 Korriku" around 5:00 or 5:30 p.m. He sat at a table with Mr. Struga, Meti, and Fatmir. He left a short time later, but before he did, he saw Mr. Struga go to a table where two young men were seated. He said that Mr. Struga either took a knife from them or showed them a knife, and Mr. Struga "placed a knife with a large handle in his waist side." After that, Mr. Kokona left the bar. He later returned to the bar, but did not see the knife in Mr. Struga's hand again. A brawl began between Gezim Celmeta and a young man with a mustache. He did not see Mr. Struga use a knife, but assumed that Struga stabbed Celmeta because "Gezim had been assaulted with a knife on the left side where [Struga] was." Mr. Kokona said that Bujar Rama hit him with a wooden spoon; he did not see Mr. Struga at that point, he "only saw Muhamet [Nezaj] who as well was being assaulted by

this individual with a mustache."

Muhamet Nezaj

Mr. Nezaj was first interviewed on June 23, 1989. He stated that on June 21, 1989, he went to the club "10 Korriku" with Fatmir Macka. They sat at a table with Adrian Kokona and Mr. Struga. After some time, Macka left; Mr. Struga went to the counter to pay, and as Mr. Nezaj was leaving, he exchanged words with someone at the first table near the entrance. At that time, Mr. Struga was on his right side and Mr. Kokona on his left, and someone punched him in his right eye. As he was falling to the ground, someone kicked him in the ribs, and he was struck in the head with something heavy. Mr. Nezaj heard later that "a young guy by the name of Gezim Celmeta" was killed at the club. He said that he did not know where Mr. Struga went or what he did, but he knew that Struga was wearing a red shirt.

Mr. Nezaj was interviewed again on June 24, 1989. He said that on June 21, 1989, he went to the club with Fatmir Macka. They joined Mr. Struga at a table where he was seated alone. Adrian Kokona arrived, sat with them for a time, and left to drop off some cigarettes for his father. Kokona returned, and rejoined him and Mr. Struga. Some time later, after they finished their drinks, they were leaving, with Mr. Struga to his right and Mr. Kokona to his left. At that time, someone punched him in the eye, and then struck him on the head with some object. He crawled out of the club, where he was struck again. The last time he saw Mr. Struga was when Struga was standing to his right, and he did not

know what Struga's actions were.

Mr. Nezaj was questioned a third time on June 26, 1989. He stated that after Mr. Kokona left to drop off the cigarettes, he saw Mr. Struga go to another table "where two gypsies were seated." Mr. Struga, he said, told the gypsies, "Hey, give me back what you took," at which point he saw Mr. Struga take a knife and place it on the left side of his waist. Mr. Nezaj stated that he asked Mr. Struga what he had, and Struga replied, "Nothing, nothing at all, I do not have anything."

Kleopatra Bega

Ms. Bega, the manager of the club, was interviewed on June 22, 1989. She saw four young men that she did not know seated at a table, drinking "Ponc" (an alcoholic beverage) and cognac. One of the men, wearing a red shirt, came to the counter to buy cognac. He had been drinking, but did not appear intoxicated "where his logic was compromised." The others at the table, however, were intoxicated to the extent that Ms. Bega asked them to leave. Some glasses had been broken, and the man in the red shirt apologized and paid for them. At some point she heard a commotion and saw that a brawl had broken out at the entrance to the club. The four men who had been seated at the table were quarreling with two other individuals. One of these two individuals was hitting the other men with a wooden object. The other was kicking the young man wearing the sky-blue shirt, and continued kicking him when he fell to the ground.

Bujar Rama

Bujar Rama's statement was taken on June 22, 1989. He was at the bar with Gezim Celmeta on June 21, 1989, when the two of them were confronted by four men, including a thinner man with a slender facr, who was wearing a red shirt, and a larger man wearing a white shirt or t-shirt. The larger man gestured as though to strike him, and Mr. Rama pulled away, believing that these four men "were looking for a reason to create mischief." The four men surrounded Gizim Celmeta, when he saw the man in the red shirt with a knife in his hand. Mr. Rama then went to the counter and grabbed an ice cream scooper. He heard a "ruckus" and tables being moved around. When he returned, Mr. Celmeta had a blood stain on his back, on the left side. However, he did not see the man in the red shirt after he grabbed the ice cream scooper.

Fatmir Xhemal Majellari

Mr. Majellari was in the club the evening of the incident in question. He had been introduced to two of the men seated at a table with Mr. Kokona and Mr. Nezaj, with whom he was acquainted. One of the men to whom he was introduced was "Selami," who he described as having a slender face and thin body. He remembered Selami as having worn a sky blue shirt. Mr. Majellari left the bar before the fight broke out.

## II. LEGAL PRINCIPLES

"Extradition is an executive rather than a judicial function." *Hoxha v. Levi*, 465 F.3d 554, 560 (3d Cir. 2006). Therefore, the Court's inquiry in deciding whether to certify

an extradition under 18 U.S.C. § 3184 is limited. At the extradition hearing, the government must show the following five factors: (1) that the judicial officer is authorized to conduct the extradition proceeding; (2) that the Court has jurisdiction over the individual whose extradition is sought; (3) that the applicable treaty is in full force and effect; (4) that the crime for which extradition is requested is covered by the applicable treaty; and (5) that there is sufficient evidence to support a finding of probable cause as to the charge for which extradition is sought. *Fernandez v. Phillips*, 268 U.S. 311, 312 (1925); *In re Drayer*, 190 F.3d 410, 415 (6th Cir. 1999).

As to the probable cause factor, it is not within the scope of the Court's inquiry to weigh the credibility of witnesses or make findings as to culpability. "An extradition proceeding is not a forum in which to establish the guilt or innocence of the accused; rather, the sole inquiry is into probable cause." *Drayer*, at 415.  Further, a defendant is not permitted to introduce evidence that merely contradicts the proofs submitted by the requesting country, although he or she may submit evidence "that explains away or completely obliterates probable cause...." *Barapind v. Enomoto*, 400 F.3d 744, 749 (9th Cir. 2005)(*en banc*), quoting *Mainero v. Gregg*, 164 F.3d 1199, 1207, n.7 (9th Cir. 1999). While the distinction between evidence that "contradicts" and evidence that "explains away" seems a bit elusive, suffice it to say that the Court is not permitted to resolve credibility contests or choose between competing versions of the facts.

### III.   DISCUSSION

Guided by the above principles, and based on evidence, exhibits, and arguments presented at the extradition hearing and in the written pleadings of the parties, I make the following findings of fact and conclusions of law.

(1) As a United States Magistrate Judge, I am a judicial officer of the United States who is authorized to conduct these extradition proceedings under 18 U.S.C. § 3184. *See Austin v. Healey*, 5 F.3d 598, 601-602 (2d Cir. 1993), *cert. denied* 510 U.S. 1165 (1994).

(2) This Court has jurisdiction over Selim Struga, who was arrested in the Eastern District of Michigan. 18 U.S.C. § 3184.

(3) The applicable treaty between the United States and the Republic of Albania is in full force and effect. *See* Government's Exhibit 2 (Declaration of Jason A. Biros, Attorney Advisor for the United States Department of State) and Government's Exhibit 3 (a copy of the treaty). Mr. Struga contests this factor, arguing that the treaty was originally signed in 1933 between the United States and the Kingdom of Albania, and that since that time, the government of Albania has changed from a kingdom to a communist dictatorship to the present Republic, which, he contends, is not the same national entity that originally entered into the treaty. However, the treaty has been reaffirmed over time, and the State Department's determination as to the enforceability of the treaty is entitled to deference. *Terlinden v. Ames*, 184 U.S. 270, 288 (1902); *Kastnerova v. United States*, 365 F.3d 980, 985-87 (11th Cir. 2004). In *Hoxha v. Levi*, *supra*, the defendant proffered

the same argument regarding the applicability of a treaty with Albania signed in 1933. The Third Circuit rejected this argument, stating that "[w]hether a treaty remains valid following a change in the status of one of the signatories is a political question, and we therefore defer to the views of each nation's executive branch." *Id* at 562. The Court found that the United States considered the treaty with Albania to be in full force and effect, as shown by the declaration of the State Department's Office of the Legal Adviser and the State Department's "Treaties in Force" list. The Court also found that the Albanian government recognizes the validity of the extradition treaty, as shown by its request in that case, and the fact that in 2003, the Albanian government ordered the extradition of an individual to the United States. *Id*. at 562-63. The Court therefore held "that the extradition treaty between Albania and the United States remains valid...." *Id*, at 563. *See also In re Extradition of Harusha*, 2008 WL 1701428 (E.D. Mich. 2008)(citing *Hoxha*).

(4) Article I of the treaty (Government's Exhibit 3) provides for the extradition of persons charged with or convicted of offenses covered in Article II of the treaty. Mr. Struga is charged in Albania with the crime of intentional murder, in violation of Article 76 of the Albanian Criminal Code. I find that this is an offense that is included in Article II. *See Harusha*, at *6 ("The crimes of murder and attempted murder are covered by the Treaty. See Treaty, Art. II, ¶¶ 1, 26.").

Mr. Struga has challenged extradition based on his claim that as of the time of his

2001 trial, the statute of limitations had run on a 1989 homicide. Indeed, the Albanian Court of Appeals apparently accepted this argument, and reversed his conviction. However, during the pendency of this action, the Supreme Court of Albania reversed the Court of Appeals and reinstated the conviction. Here, challenges under the statute of limitations regarding charges under Article 76 of the Albanian Criminal Code involve questions of Albanian law. "[I]t has long been recognized that an extradition judge should avoid making determinations regarding foreign law." *Skaftouros v. United States*, 667 F.3d 144, 156 (2d Cir. 2011). Further, "[i]n addition to principles of international comity, the reluctance of our courts to fastidiously examine foreign law in extradition proceedings is founded in principles of judicial modesty." *Id*. If Mr. Struga is ultimately extradited, he may of course pursue whatever remedies he may have in the Albanian courts, including defenses based on the statute of limitations. But it is not for this Court to second-guess or preempt the Albanian courts, and it is certainly beyond this Court's power to overrule the Albanian Supreme Court.

(5) The government has shown probable cause that Mr. Struga committed the charged offense, intentional murder. Indeed, Mr. Struga's own exhibits support a finding of probable cause. It is true that no witness directly stated that he or she saw Mr. Struga in the act of stabbing Mr. Celmeta. However, there is circumstantial evidence that he did so. In his first statement, Adriatik Kokona told the police that he did not see Mr. Struga with a knife. In his second statement, however, he said that at some point before the brawl, he

saw Mr. Struga "place[] a knife with a large handle in his waist side." Muhamet Nezaj also said he saw Mr. Struga with a knife.

Mr. Kokona also said that Mr. Struga was wearing a red shirt that night. Bujar Rama stated that around the time of the fight, he saw the man in the red shirt with a knife in his hand. He went to grab the ice cream scooper, and when he returned to the melee, Mr. Celmeta's back was blood-stained.

The manager of the club, Kleopatra Bega, said that a polite young man in a red shirt paid for the broken glasses; Mr. Kokona said that Mr. Struga, who was wearing a red shirt, paid for the broken glasses.

Thus, there is evidence (1) Mr. Struga had possession of a knife shortly before the fight; (2) Mr. Struga was wearing a red shirt; (3) the man in the red shirt had a knife in his hand at the time of the fight; (4) during the fight, Mr. Celmeta was stabbed in the back with a knife; and (5) Mr. Celmeta died as the result of his injuries. This constitutes a circumstantial chain of evidence supporting a finding of probable cause that Mr. Struga committed the charged offense.

I recognize that the proofs are not unimpeachable. In his initial statement, Mr. Kokona said that he never saw Mr. Struga with a knife. It was only in his second statement, after he himself had been threatened with prosecution, that he said he saw a knife. Likewise, Mr. Nezaj did not come up with his story about Mr. Struga having a knife until his third interview with the police. And Mr. Majellari said that Mr. Struga was

wearing a blue shirt, not a red shirt. But whether or not Mr. Struga could ultimately be found guilty is beside the point; it is not for this Court "to determine whetner the evidence is sufficient to justify a conviction." *Hoxha*, 465 F.3d at 561.

While the requirements of 18 U.S.C. § 3184 having been satisfied, I add one caveat. Mr. Struga's trial and conviction *in absentia* "is contrary to not only the Constitution of the United States, but it also appears to violate the 1993 Albanian constitution." *Harusha*, at *11. In support of its recommendation of a conditional extradition, *Harusha* relied in part on 18 U.S.C. § 3185, which provide, in pertinent part:

> "[S]uch person shall be returned and surrendered to the authorities in control of such foreign country or territory on the order of the Secretary of State of the United States, and such authorities shall secure to such a person a fair and impartial trial." *Id*. at 11-12.

In this case, the government states that it has received assurances from the Republic of Albania "before surrendering the fugitive, that the person will have an opportunity to challenge the in absentia conviction and seek a new trial upon his or her return." *Government's Submission in Support of Extradition* [Doc. #21], at 7. As was the case in *Harusha*, however, I believe that extradition should be conditioned on an assurance that Mr. Struga will *receive* a new trial in Albania, not just that he will have the right to *seek* a new trial. I therefore adopt the following conclusion of *Harusha*:

> "This Court therefore urges the United States Department of State to honor the representations it has made to this Court through counsel for the Government and obtain assurances from the Albanian government that [the defendant] be granted a new trial before [he] is surrendered to Albania pursuant to the treaty." *Id*. at 12.

The government has also represented that the Republic of Albania has agreed to credit the time Mr. Struga has been detained pending these proceedings against any future sentence for the charged offense. I therefore also urge the United States Department of State to obtain assurances from the Republic of Albania regarding sentencing credit.

### IV.    CONCLUSION

IT IS HEREBY CERTIFIED that Selim Struga is subject to extradition to the Republic of Albania to answer to the charge of intentional murder. The Court refers this matter to the United States Secretary of State for its determination of whether to surrender Mr. Struga to authorities in the Republic of Albania.

The attorney for the United States shall obtain transcripts of all testimony presented before the Court and shall deliver forthwith the said transcripts of testimony to the Clerk.  The Clerk shall forward to the Secretary of State a copy of this Certification and Order together with transcripts of testimony and copies of documents received as evidence.

Selim Struga will remain detained in the custody of the United States Marshal Service pending the United States Secretary of State's determination of whether to grant the Republic of Albania's request for extradition.

IT IS SO ORDERED.

s/R. Steven Whalen<br>
R. STEVEN WHALEN<br>
United States Magistrate Judge

Dated: February 7, 2017

CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing document was sent to parties of record on February 7, 2017, electronically and/or by U.S. mail.

s/Carolyn M. Ciesla<br>Case Manager